## Schmid, Appellant, v. Lancaster Avenue Theatre Company.

*Equity—Equity practice—Averments of actual fraud—Evidence of constructive fraud—Allegata and probata.*

1. The failure of a complainant in a bill in equity to sustain by evidence a positive averment of actual fraud, will not entitle the defendant to a dismissal of the bill when there is proof of constructive fraud.

*Corporations—Directors—Fraud—Actual and constructive fraud —Rights of minority stockholders—Equity—Injunction—Voidable contracts—Ratification by stockholders.*

2. The directors of a corporation are bound to administer its affairs with strict impartiality, in the interest of all the shareholders alike; and the inability of minority stockholders by their own efforts to protect themselves against unauthorized acts performed with the connivance of the majority, renders their right to the protection of the courts the more clear.

3. A lease of the entire property of a corporation to another corporation in which the directors of the lessor who vote for the lease are financially interested, when another equally responsible party stands ready, and offers to pay a much greater rental for the same property, and the directors of the lessor have knowledge of such offer, is, except as otherwise explained, an actual fraud; and if the directors who vote for such lease are not financially interested in the lessee, the law would condemn the transaction, unexplained, as a constructive fraud upon dissenting stockholders.

4. While a corporation may ratify voidable contracts made by its directors, ratification is not proved by showing that the majority stockholders of a corporation in subservience to whose interests the directors made a voidable contract, subsequently voted to approve the action of the directors, against the protest of the minority.

5. On the hearing of a bill in equity brought by the minority stockholders of a theatre company to enjoin the renewal of a lease of all the corporate assets of such company to an amusement com-

pany, it appeared that one of the directors of the plaintiff's corporation owned a large majority of the stock in the amusement company; that the three directors who voted to authorize the making of the lease at a meeting at which five directors voted, were the sons of two stockholders who owned the majority of the stock in the amusement company, and had received their stock in the theatre company which qualified them to act as directors as a gift from their respective fathers; and that such directors, with their fathers, owned a majority of the stock of the theatre company. The lease complained of provided for the payment of an annual rental of $22,500, while a third party, equally responsible, had offered and was ready to pay an annual rental of $30,000 for a lease on the same terms in other respects. The two directors who voted against the lease owned a minority of the stock of the theatre company and owned no stock in the amusement company. At a meeting of the stockholders of the theatre company the stock owned or represented by the three directors who voted for the lease was voted to ratify the action of the board, and the stock owned by the directors who voted against the making of the lease was voted to disaffirm the action of the board. The controlling stockholder of the amusement company was its president and manager and if the lease were executed he would have had charge of the management of the theatre, which had been conducted along successful lines, but by its terms the lease was assignable with the consent of the lessor. *Held,* that the lower court erred in dismissing the bill.

Argued Jan. 13, 1914. Appeal, No. 344, Jan. T., 1913, by plaintiffs, from decree of C. P. No. 2, Philadelphia Co., March T., 1912, No. 1569, dismissing bill in equity for an injunction in case of Mathew Schmid and William A. Schmid v. Lancaster Avenue Theatre Company, W. W. Miller, Joseph S. Miller, Gustavus A. Muller, Gustavus C. Muller, Walter H. Muller, and Penn Charter Amusement Company. Before Mestrezat, Potter, Elkin, Stewart and Moschzisker, JJ. Reversed.

Bill in equity to enjoin the execution of a lease. Before Sulzberger, P. J.

The opinion of the Supreme Court states the facts.

The court on final hearing dismissed the bill. Plaintiffs appealed.

*Errors assigned* were various findings of fact and law of the trial judge, and the decree of the court.

*John G. Johnson*, with him *Benjamin O. Frick*, for appellants.—The question is not one of judicious management, but of recklessly improper management, because of the interested motives of the majority directors and stockholders: Library Hall Co. v. Pittsburgh, 173 Pa. 30; Booth v. Land Filling & Imp. Co., 68 N. J. Eq. 536; Burden v. Burden, 124 Fed. Repr. 250; Robotham v. Insurance Co., 64 N. J. Eq. 673; Pearson v. Railroad Co., 62 N. H. 537; Gamble v. Water Co., 123 N. Y. 91; Flynn v. Brooklyn City R. R. Co., 158 N. Y. Rep. 493; Geddes v. Anaconda Copper Min. Co., 197 Fed. Repr. 860; Weckerly v. Fell, 22 Pa. C. C. R. 209.

The lease of all the corporate assets to the majority stockholders, where a higher price was offered by a third party, was fraudulent: Wilson v. Central Bridge, 9 R. I. 590; Gregory v. Patchett, 33 Beav. 595; Devine v. Frankford Steel & Forging Co., 205 Pa. 114; Meeker v. Winthrop Iron Co., 17 Fed. Repr. 48; Wheeler v. Bank Bldg. Co., 159 Fed. Repr. 391.

*Alex. Simpson, Jr.*, with him *Ehrlich & Archbald*, for appellees.—A director or stockholder may lawfully vote upon a proposition in which he is pecuniarily interested: Wolf v. Penna. R. R. Co., 195 Pa. 91; Chambers v. Glass Co., 185 Pa. 105; Library Hall Co. v. Pittsburgh Library Assn., 173 Pa. 30; Russell v. Patterson, 232 Pa. 113. The majority stockholders are not trustees for the minority: Gamble v. Water Co., 123 N. Y. 91; Trimble v. Am. Sugar Ref. Co., 61 N. J. Eq. 340; Wallace v. Railroad Co., 12 Hun. (N. Y.) 460; Hart v. R. R. Co., 89 Hun. (N. Y.) 316.

OPINION BY MR. JUSTICE STEWART, March 9. 1914:

The bill in this case was filed to restrain a proposed renewal of the lease of the William Penn Theatre on

Lancaster avenue, Philadelphia, by the William Penn Theatre Company to the Penn Charter Amusement Company, incorporated, for a period of five years from October 1, 1914, at an annual rental of $22,500. The bill averred that the renewal of the existing lease as proposed would be a fraud on plaintiffs' rights as minority stockholders; inasmuch as at a meeting of the board of directors at which a renewal of the lease was decided on, and before such action was taken, a written offer from a responsible and equally capable party was submitted, agreeing to accept a lease of the theatre for a like term paying therefor an annual rental of $30,000, giving satisfactory security therefor; which offer was rejected, and the lease to the Penn Charter Amusement Company ordered by a vote of three to two, the three parties voting in the affirmative being interested in the Penn Charter Amusement Company. The answer filed raised but few questions of fact; it denied that the three directors who voted in favor of the lease to the amusement company were interested financially in said company, and, without assigning any reasons for the rejection of the higher rental offered, denied all fraudulent design or effect. Upon hearing plaintiffs' bill was dismissed. The appeal is from the decree dismissing the bill. We excerpt from the findings of fact by the learned chancellor such as we regard important to a correct understanding of the case and the termination of the question here raised.

The Lancaster Avenue Theatre Company was incorporated in March, 1909, for the purpose of building, maintaining and managing theatres, &c., with a capital stock of 500 shares of the par value of $100. Within a few months thereafter the capital stock was increased to $150,000, consisting of 1,500 shares. Of these, 1,120 of the par value of $100 were issued in return for cash payment as follows: 339 shares to W. W. Miller; 392 shares to Gustavus A. Muller, and 389 shares to Mathew Schmid. On December 8, 1911, the holding of these

shares was as follows: W. W. Miller 338, Joseph S. Miller, son of W. W. Miller, 1, Gustavus A. Muller 131, Gustavus C. Muller 130, Walter H. Muller 131, Mathew Schmid 333, and William A. Schmid, son of the latter, 56. The Lancaster Avenue Theatre Company was thus practically a close corporation. Three families or interests were engaged in it. Out of the total number of shares the Miller family held 339, the Muller family 392, and the Schmid family 389. In August, 1909, the above named W. W. Miller organized the Penn Charter Amusement Company, with a capital stock of fifty shares of the par value of $100 each. These shares were issued as follows: Five to Metzel, secretary of the company, seven and one-half to Gustavus A. Miller and thirty-seven and one-half to W. W. Miller. The company has no other assets. Upon the completion of its building the William Penn Theatre Company leased it to the Penn Charter Amusement Company, then and now controlled by the said W. W. Miller, who is the president of both companies, for a term of five years from September, 1909, at a yearly rental of $20,000, the plaintiffs in the present bill assenting. Before one-half of the term of this lease had expired, 8th December, 1911, at a meeting of the board of directors of the William Penn Theatre Company, a renewal of the lease to the Penn Charter Amusement Company for a period of five years from the expiration of the existing lease at a rental of $22,500 per annum, was ordered. The consideration of the matter was postponed until the meeting of 5th March, 1912. At the meeting held on this later date all the directors (comprising all the stockholders) with the exception of Gustavus A. Muller, were present, W. W. Miller presiding. After other business had been finished Miller called to the chair Gustavus C. Muller, and then personally submitted the proposition of the Penn Charter Amusement Company for renewal of its lease of the theatre, and asked that it be accepted upon the terms therein indicated. Before the vote was taken a written

offer was submitted by Mathew Schmid from Fred G. Nixon-Nirdlinger, a successful lessee and manager of theatres, and a man of financial responsibility, to lease the theatre at the end of the current term for a term of ten or five years, as might be desired, at an annual rental of $30,000, in which offer it was stated that "they (himself and parties associated) were prepared to secure the lease with any reasonable security your company may elect." Both Nirdlinger and Schmid testified that the latter was not a party to the offer, and this testimony was not contradicted in any way. Miller resuming the chair, two resolutions were proposed and passed, one accepting the offer of the Penn Charter Amusement Company for renewal of its lease at a rental of $22,500 per annum, the other directing that the lease be executed. Though all the directors were present, excepting Gustavus A. Muller, there were but five votes, those voting in the affirmative were Gustavus C. Muller, Walter H. Muller and Joseph S. Miller, neither of whom had financial interest in the Penn Charter Amusement Company; those voting in the negative were the two Schmids. Within a few days after this action was taken the plaintiffs filed their present bill. Thereupon a stockholders' meeting of the Lancaster Avenue Theatre Company was called. At this meeting a resolution approving the action taken at the directors' meeting was adopted, the Miller and the Muller interests voting 730 shares in support of the action of the directors and the Schmid interests 389 shares in the negative.

Such are the general findings of fact. While several of them are challenged as incorrect by the assignments of error, there is but one of sufficient materiality to call for discussion, and that only because the learned chancellor has derived from it his governing conclusion, that the action of the directors in voting the lease to the Penn Charter Amusement Company stands clear of fraudulent design or effect. The finding is that neither of the directors who so voted, Gustavus C. Muller, Wal-

ter H. Muller and Joseph B. Miller, was financially interested in the Amusement Company. While it is true that plaintiffs aver in their bill that the parties named were financially interested in the amusement company, it by no means follows that they are entitled to the relief prayed for only as they have succeeded in establishing this particular fact. What the bill specifically charges is, that the execution of the proposed lease to the amusement company would be a fraud on plaintiffs' rights as minority stockholders in the Lancaster Avenue Theatre Company, for the reason that it is a lease of the entire property of the theatre company at a rental of $22,500 per annum, when another equally responsible party stood ready and offered to pay an annual rental of $30,000 for the same property, a fact known to the directors at the time. If this result was reached by the votes of directors financially interested in the amusement company, except as otherwise explained, the law would refer it to the fact stated and condemn it as an actual fraud; if by the votes of directors not financially interested in the amusement company, unexplained, the law would condemn it none the less, but, as a constructive fraud, one not depending on fraudulent intent, but one arising by legal implication. The failure of a complainant to sustain the positive averment of actual fraud, will not entitle the defendant to the dismissal of the bill, when there is proof of constructive fraud. Ricketts's Appeal, 9 Sadler 247. So, if the finding that the directors named were without financial interest in the amusement company were to be sustained, it would not by any means be conclusive of the controversy. So much with respect to the legal conclusion derived by the chancellor. Now as to the finding itself. Certainly it cannot be said that the evidence supports it except as the finding is to be understood in a very qualified sense. If all that it means is that neither of these parties was the owner of stock in his own name in the amusement company, it is correct; but, understood in the larger sense as indi-

cating that neither was in position to be individually advantaged by the financial success of the amusement company, it would be manifest error. Of the parties here involved, Joseph S. Miller was the son of W. W. Miller, the owner of a very decided majority of the stock of the amusement company; the two Mullers were sons of Gustavus A. Muller, the only person holding any considerable part of the remainder of that stock. These were the only directors voting affirmatively for the lease at a meeting where every director and stockholder of the theatre company was present, excepting Gustavus A. Muller. Joseph S. Miller was the holder of one share of stock in the theatre company given him by his father W. W. Miller; one of the Mullers held 130 shares, given him by his father; the other, 131 shares, acquired in the same way. With the status of the parties thus fixed with respect to their several holdings in the theatre company, another distinct finding by the chancellor, which we here quote at length enables us to understand fully what the vote cast by each of these directors represented: "19. Gustavus C. Muller, Walter H. Muller and Joseph S. Miller had no financial interest in the Penn Charter Amusement Company, and each of them owned absolutely the stock in the Lancaster Avenue Theatre Company, standing in his name. It is a fact, however, that these sons of their fathers look upon the several interest in this transaction as composed of three family interests, and that the members of each family regard the interest of its head as their own interest. This view, though not merely financial and in some respects perhaps sentimental, undoubtedly colors the relations of the parties concerned. Gustavus C. Muller and Walter H. Muller look upon the interest of their father, Gustavus A. Muller, as their own; Joseph S. Miller looks in the same manner upon the interest of his father, Wm. W. Miller; and William A. Schmid does the like as regards the interest of his father, Mathew Schmid." This finding either means a community of financial interests be-

tween the membership of each family group according to its stockholding, or it means nothing. As we read it, it means even more than a community of interest; it is a clear finding that the determining power in each group was in its head, and that the collective power of the group in the management of the affairs of the theatre company was always directed to the attainment of ends which met the views and better secured the interest of its head. This finds appropriate illustration in the vote by which the resolution was passed giving the lease to the amusement company. The meeting that was called to take action on the proposed lease was presided over by W. W. Miller, the largest stockholder both in the theatre company and in the amusement company. He was actively urging that the lease be given to the latter company—virtually to himself, since in his testimony he speaks of it as his own—but refrained from voting, allowing his son Joseph S., the holder of but one share, to cast for the family group the determining vote, for without that vote in the affirmative the resolution would have failed of adoption. Gustavus A. Muller was absent but was represented by his two sons, these voting in the affirmative with Joseph S. Miller to give the lease to the amusement company in which the head of this particular group was a stockholder. The disguise attempted at the meeting of having those only vote who were not involved stockholders of the amusement company, does not and cannot conceal the fact that the interests which these votes represented and expressed were the same interests that owned and controlled the amusement company. In the very qualified sense we have above indicated the finding of the chancellor that these directors were without financial interests in the amusement company may be sustained; but so qualified it is without effect. In any larger sense it could not be sustained. Our own finding is that while these directors were not individual shareholders in the amusement company, each is shown to have had such a substantial interest in

the subject as disqualified him from voting on the question. It is further apparent that these men were directors, if not by the direct selection of W. W. Miller and Gustavus A. Miller, certainly by their grace and sufferance; and it is manifest from the chancellor's finding above that they were there to act consistently with the views and wishes of those who gave them their tenure of office. "Nothing can be more unjustifiable and dishonorable than an attempt on the part of those holding a majority of the shares in a corporation to place their nominees in control of the company and then use their control for the purpose of obtaining advantages to themselves at the expense of the minority; it would be a conspiracy to commit a breach of trust. The directors of a company are bound to administer its affairs with strict impartiality, in the interest of all the shareholders alike; and the inability of the minority to protect themselves against unauthorized acts performed with the connivance of the majority, renders their right to the protection of the courts the more clear." Morawetz on Private Corporations, section 529. We need not stop to point out the applicability of this rule to the determining vote of Joseph S. Miller, the holder of a single share of stock, the gift of his father.

But even were we to admit entire exoneration of these directors from the charge that they were financially interested in the amusement company, how would the case then stand? Here was a transaction begun and ended by these directors which on its face shows an acceptance by the directors of an annual rental for the company's property of $22,500 for a term of five years, and the rejection of an offer by an admittedly responsible party to rent the same, under the same terms, for the same period, at an annual rental of $30,000, involving a total loss to the company of $37,500. The good faith of the parties responsible for the transaction is questioned in a legal proceeding begun by dissatisfied stockholders. Unexplained, the transaction, so mani-

festly and seriously prejudicial to the rights of the minority, might well give rise in the mind of the questioning party to something stronger than mere suspicion that the interest of the shareholders had for some reason been improperly sacrificed, if not for reasons of private gain, through favoritism or some other equally reprehensible consideration involving gross dereliction of duty. It is too clear for discussion that under such conditions as we have here, with the rejection of the higher bid and the acceptance of the lower admitted in the pleadings, the onus rested upon the parties responsible for the fact to show the fairness of the transaction. Except as explained so as to make it consist with good faith, the legal inference would be that either through design or by wilful neglect on the part of the directors, it was in effect an appropriation of corporate assets to other than corporate purposes. The answer filed contained no explanation whatever. We have to look to the testimony of these directors to ascertain the reasons for their votes. Each asserts that he voted in good faith; but that is a matter to be judged of by the sufficiency of the reasons given. First, Gustavus C. Muller thus states his reasons: "I voted that day for the continuance of the lease to Mr. Miller, for this reason: When the proposition was first spoken of, the purchase of the building and operating the William Penn theatre, Mr. Miller, Mr. Schmid and my father had a talk. That talk was that they would go in on thirds and complete the house, and Mr. Miller should be lessee. I don't believe he would have gone in if it hadn't been for the promise. I also voted because I thought the house had been successful and was operating in a successful manner. Everybody seemed pleased with it. People came to me and complimented me on the conduct of the house, and everything else, and, as I stated before, it makes no difference to our side, one way or another, whether the lease would be held by Mr. Miller or whether it would be held by Mr. Nixon, financially." He was asked the

following question: "Just give us all the reasons why, acting out of a high regard for good faith, you voted to turn down a proposition to take $30,000 rent, and accepted one to pay but $22,500. Without characterizing your action at all, give us the reason for it." His answer was, "Because, financially, it didn't make any difference one way or another." This question followed, "And therefore, inasmuch as it didn't make any difference to you, owing to this balance of interest, you voted in favor of the lower rental, and disregarded the fact that it did make a difference to another stockholder. Is that so?" To this he answered, "That is so." Walter H. Muller's explanation was as follows: "I done that in good faith and the reason of voting that way was I thought as long as Mr. Miller had had the lease for five years and carried the theatre on in a successful way, that it was better to take a chance on him than on some new party we didn't know anything about." On cross examination he was asked, "Why did you vote to take $7,500 a year less rent, and so throw away your one-third of it, or $2,500?" His answer was, "As my brother testified, it didn't make any difference which way the lease went." This question followed, "And that is the reason you gave it?" "No; I voted that way because I thought Mr. Miller the most responsible party." Then to the question, "You didn't make any inquiry about the other?" the answer was, "No, only from what we heard." Joseph S. Miller's explanation was "My main reason was a continuance of the successful tenancy of the house, the continuing of the policy of the house along successful lines, which meant the enhancing of the value of the property, and a further reason was I didn't consider the offer of Mr. Fred G. Nixon-Nirdlinger as having been made in good faith.......I was influenced by the fact that he was a successful tenant of the house and wanted to continue the lease of the theatre." The united testimony of these witnesses, giving it the most favorable construction, is to the effect that in voting for a resolution which vir-

tually gave to W. W. Miller, a stockholder with themselves,—we say Miller rather than the amusement company, for the reason that he himself testifies, and so do the other witnesses, that while the lease was in the name of the amusement company as lessee the lease was virtually to himself—a bonus of $7,500 a year for five years in connection with the lease of the company's theatre, they were governed solely by the consideration that it would be to the advantage of the company to continue Miller's management even at such a cost. The explanation would not have been so absolutely destitute of merit, however much it might have reflected on the business judgment of the parties, had not the lease agreed upon provided that the lessee could assign it at any time to any person acceptable to the lessor. The lease therefore did not secure Miller's management of the theatre, and this fact must have been known to the directors. There was nothing in the lease to prevent Miller from immediately assigning it to Nirdlinger, whose bid had been rejected, for the rental the latter had proposed to give, and in so doing Miller would have been appropriating to himself the amount that the theatre company had sacrificed in its lease to him. With the board constituted as it was he could very confidently have counted upon a ratification of the assignment because, if for no other reason, Nirdlinger, as shown by this record, is a successful theatre manager, of large experience and financial ability. The case on this branch of it admits of but one conclusion, namely that the interests of the minority stockholders were designedly sacrificed by men into whose charge the entire corporate affairs had been committed upon the trust and confidence that they should be cared for and managed for the interest of all the stockholders.

But one thing remains to be considered: the ratification of the lease by the stockholders. At the meeting at which this was done the Miller and the Muller stock was voted in affirmance and the Schmid in the negative.

That a voidable contract entered into by the directors of a corporation may be ratified by the stockholders is not open to question, but the contract here as expressed in this proposed lease was more than this, as we have attempted to show; it was in itself a fraud upon the minority rights, and the admitted ratification was by the same stock majority that passed the lease. Moreover, we have found the lease to be seriously prejudicial and detrimental to corporate interests. It is only when the transaction is not in fact fraudulent or detrimental to the corporate rights that it is susceptible of ratification. Morawetz on Private Corporations, section 626. In the present case it was both.

We are of the opinion upon a careful review of the case that complainants were entitled to the relief they sought, and it is now ordered, that the decree dismissing the bill filed be reversed, that the bill be reinstated, and that an injunction issue as prayed for in plaintiffs' bill.