**HIRSHHORN et al. v. MINE SAFETY AP-PLIANCES CO. et al.**

No. 10894.

United States Court of Appeals
Third Circuit.

Argued March 6, 1953.

Decided April 2, 1953.

See also, 3 Cir., 193 F.2d 489.

John B. Doyle, New York City (Pruitt, Desvernine & Coursen, New York City, Walker & Newman, Pittsburgh, Pa., Edwin A. McGuire, New York City, on the brief), for appellant.

Charles E. Kenworthey, Pittsburgh, Pa. (Paul E. Hutchinson, Gilbert J. Helwig and Reed, Smith, Shaw & McClay, Pittsburgh, Pa., on the brief), for appellee.

Before McLAUGHLIN, STALEY and HASTIE, Circuit Judges.

McLAUGHLIN, Circuit Judge.

Plaintiff, a resident of New York, appeals from the dismissal of his complaint by the district court sitting without a jury. The action is a double derivative stockholders' suit on behalf of plaintiff and other stockholders of Carbon Monoxide Eliminator Corporation, a Delaware corporation, and Catalyst Research Corporation, a Maryland corporation. The defendants are the two named corporations and Mine Safety Appliances Company, a Pennsylvania corporation, as well as various directors and officers of the three corporations and their representatives. For convenience the corporate defendants will be referred to as Mine Safety, Carbon and Catalyst.

Mine Safety, the dominant corporation, was organized in 1917 to succeed a partnership. It is engaged in the manufacture of industrial and military safety equipment and is reputedly the largest manufacturer of such equipment in the world.

Carbon was incorporated in 1929 to develop a method for eliminating carbon monoxide from the exhaust gases of internal combustion engines through the use of a catalyst called hopcalite. While Mine Safety has always owned a controlling interest in Carbon plaintiff has since 1931 acquired 20,000 of Carbon's 157,000 outstanding shares of stock.

Catalyst was organized in 1930 to develop and exploit hopcalite in fields other than carbon monoxide elimination. Frazer, the inventor of hopcalite, was given 40% of Catalyst's stock in exchange for licensing his patent to the corporation; the remaining 60% was issued to Carbon under an agreement whereby it was to advance a total of $50,000 in annual installments to Catalyst.

Although the parties did not reprint the complaint in their appendices, a reading of the trial court's comprehensive findings of fact and conclusions of law reveals that defendants were charged with various acts of corporate mismanagement and the exploitation of Carbon and Catalyst. The most serious claim, and the only one pressed on this appeal, relates to the acquisition and subsequent sales by Mine Safety of a so-called rebreather device to which, it is alleged, Catalyst had certain rights by virtue of the fact that a Catalyst employee, C. B. Jackson, made several inventions which

were instrumental in its development. To dispose of this appeal we must resolve three questions:

(1) Was Jackson employed by Mine Safety or Catalyst at the time he made his rebreather inventions?

(2) Were Jackson's rebreather inventions made in connection with the business of Mine Safety or Catalyst?

(3) Did Catalyst, as the subject corporation, have any rights in the rebreather or in profits made from sales of the rebreather?

 Under familiar rules governing appellate review we are limited, so far as the factual issues are concerned, to determining whether the trial court's findings are clearly erroneous.

 From 1930 to 1935 both Carbon and Catalyst had their place of business in Baltimore. During that period the bulk of Catalyst's research was done by Frazer and a chemical engineer named Bennett. Early in 1931 Catalyst employed a young chemist, C. B. Jackson, then a student at Johns Hopkins University where Frazer taught, as research assistant. At the time Jackson began his employment he executed a covenant with Catalyst wherein he agreed that all inventions, ideas and discoveries made in connection with the business of Catalyst would belong to that corporation. The agreement was, by its terms, binding only during his employment by Catalyst. In 1934 Jackson left Catalyst to work for Armour & Company in Chicago, returning in April, 1935, at which time he executed another covenant substantially identical with the 1931 agreement.

In 1935, upon Jackson's return to Catalyst, the base of operations of Carbon and Catalyst was, for reasons of economy, moved from Baltimore to the second floor of a building owned by Mine Safety in Pittsburgh. The court below found that pursuant to an arrangement arrived at by the corporations Jackson worked for both Catalyst and Mine Safety from 1935 to 1940,[1] his salary being allocated between the corporations. The trial judge further found that the utilization of services and the allocation of salary between the corporate defendants was entered into in good faith and was fair and to the best interests of Carbon and Catalyst.[2]

From April, 1935, until mid-1936 Jackson was engaged in several relatively minor matters for Mine Safety. His work for Catalyst during that period was confined to research on a hydrogenation catalyst. There was testimony that upon completion of his catalyst research and for lack of other work he spent a part of the summer of 1936 playing golf. In the meantime the officers of Catalyst were considering whether to begin manufacturing the catalyst on a commercial basis. The district court found that by the end of 1938 it was determined that commercial production was not practicable and the project was abandoned.

In September, 1936, Mine Safety was engaged in developing a rebreather.[3] Its director of research asked Jackson to work on it for Mine Safety and Jackson did so. Though he was only one of several scientists so employed he did make important contributions to the project and obtained several patents on inventions relating to that work, all of which he assigned to Mine Safety.[4] The evidence indicates that Jack-

---

1. It was not until 1940 that Jackson appears to have severed all his connections with Catalyst to work exclusively for Mine Safety.

2. This is supported by findings that neither Carbon nor Catalyst was commercially successful and the inference from all of the evidence that those corporations were not financially able to continue paying Jackson's full salary.

3. The rebreather is a mechanism contain-

ing chemicals which, when acted upon by the moisture of the wearer's breath, releases oxygen and makes it possible to rebreathe air without the necessity of carrying an oxygen tank.

4. The district court found that Jackson expressly or impliedly agreed to assign inventions made in connection with Mine Safety projects to that corporation. Jackson did not enter into a formal written contract with Mine Safety until March 1, 1938.

son's inventions, while not patented until 1939 and later, were conceived from 1936 to 1938. The rebreather was perfected by 1939 and was sold in large quantities, particularly to the government during the late war. All sales were made by Mine Safety and all profits thereon, which were considerable, were retained by it.

It is clear that except for such rights as Catalyst may have to the rebreather by virtue of the relationships of the three corporations the validity of its claims to that invention depends upon Jackson's 1935 covenant. By the terms of the latter Catalyst was entitled to ownership of any discoveries or inventions made by Jackson (1) in connection with the business of and (2) during his employment by Catalyst.

The trial court held, 106 F.Supp. 594, and we agree, that under the applicable Pennsylvania law Jackson's employment with Catalyst was an employment at will. Hogle v. De Long Hook & Eye Company, 1915, 248 Pa. 471, 94 A. 190, and that his employment by Mine Safety did not depend upon his first terminating his connection with Catalyst. Restatement of Agency, Section 226, Comment b; Shaw v. Monessen Southwestern Ry. Co., 3 Cir., 1953, 200 F.2d 841. Appellant does not dispute this latter principle but asserts that Jackson was solely employed by Catalyst during the critical period. In support of this proposition he relies on an affidavit made by Jackson in October, 1942, in connection with a patent application wherein he states that he was employed by Catalyst from 1935 to 1940 and by Mine Safety since that date.[5]

This affidavit is of doubtful value to appellant. Jackson's testimony shows that he was confused as to which of the corporations employed him at specific times during the 1930's. He testified that Mine Safety's patent attorneys prepared the patent application for his signature but could not recall whether he had supplied the information contained therein. This same affidavit recites that Jackson was employed by Carbon from 1930 to 1934 and mentions no employment by Catalyst until 1935, although he originally came to Catalyst in 1931 and was with that concern until sometime in 1934, and in 1931 had executed his first covenant in favor of Catalyst, referred to earlier in this opinion.

It would serve no useful purpose to detail all the evidence relating to Jackson's employment and other issues of fact. Suffice it to say the findings that Jackson was employed intermittently by both Mine Safety and Catalyst over the period 1935–1940 and that the resultant allocation of services and salary was fair and to the best interests of Catalyst are fully supported by the record, as are the determinations that Jackson's rebreather inventions were made in connection with the business of Mine Safety, not Catalyst,[6] and that he was employed by Mine Safety, not Catalyst, at the time he conceived them.

Finally, we must determine whether Catalyst and, indirectly, Carbon are entitled to rights in the rebreather because of the intercorporate arrangement whereby Jackson's services were used by Mine Safety, the dominant corporation.

5. Appellee argues that the affidavit was not admitted as substantive evidence bearing on the issue of Jackson's employment but was used by plaintiff in cross-examining Jackson, his own witness, after a plea of surprise, presumably to neutralize his testimony. Appellant, on the other hand, states that it was admitted on the question of employment. The only excerpt from the trial transcript appearing in either party's appendix which relates to this point indicates that the trial court expressly ruled it would not consider the affidavit as proof of Jackson's employment. No exception was taken to this ruling by plaintiff, nor is any mention of the affidavit made in the district judge's findings and conclusions. We have ourselves examined the full trial transcript and find that appellee's position is justified. However, this is of no ultimate importance since in our view of this case the purpose for which the affidavit was admitted would not affect the result.

6. Although Catalyst's charter may have been flexible enough to permit it to produce the rebreather, there is no evidence that it did so. On the other hand there is ample evidence that Mine Safety was empowered to and did develop that device.

Appellant finds no fault with the district court's holding that because of its control of Carbon and Catalyst through stock ownership and interlocking directorates Mine Safety owed those corporations and their shareholders the same fiduciary obligations it owed its own stockholders. This rule of law was recognized by the Supreme Court in the leading case of Pepper v. Litton, 1939, 308 U.S. 295, 60 S.Ct 238, 84 L.Ed. 281, and is equally applicable in Pennsylvania, Weisbecker v. Hosiery Patents, Inc., 1947, 356 Pa. 244, 51 A.2d 811, whose law governs these intercompany dealings. It seems just as apparent that the burden of proving that such transactions were entered into in good faith and that they are inherently fair and free of fraud, consistent with this fiduciary obligation, is on Mine Safety. Pepper v. Litton, supra; Bonini v. Family Theatre Corporation, 1937, 327 Pa. 273, 194 A. 498. As indicated in our earlier discussion, we are not persuaded that, on the facts, the trial court was in error in holding that Mine Safety had sustained this burden and that the arrangement of sharing Jackson's services and salary was fair and to the best interests of Catalyst. To the extent that Mine Safety's alleged misappropriation of the rebreather resulted from the mismanagement of Carbon's or Catalyst's own directors [7] the trial

court properly found that the burden was on the plaintiff and that it had not been sustained. The applicable law on this phase of the suit is that of Delaware and Maryland, the respective states of incorporation, but since it is not at variance with Pennsylvania's, it will not be necessary to discuss it separately.

Appellant suggests that the arrangement whereby Jackson worked for both Mine Safety and Catalyst after his return in 1935 is a nullity because minority stockholder approval was neither requested nor obtained. We cannot agree that such approval is a *sine qua non* to the validity of the arrangement.[8] The decisions on which he relies, such as Pennsylvania Knitting Mills Corp. v. Bayard, 1926, 287 Pa. 216, 134 A. 397, involve intercorporate transactions obviously entered into to mulct the stockholders of the subject corporation and are inapposite here where the controlling corporation has established the fairness and good faith of the transaction.[9]

A logical application of the theory which appellant espouses would require that whenever there is any intercorporate dealing, no matter how unimportant it might be, it must be passed upon by the minority stockholders of the subject corporations. The instant case, seen in its proper perspective,

7. This allegation is, practically speaking, the same as the charge that Mine Safety violated its fiduciary duty to Carbon and Catalyst, since the directors of all three corporations were virtually identical.

8. That under Pennsylvania law transactions between corporations having interlocking directorates are not void but only voidable and that fraud or unfairness must be shown to avoid them, see Bonini v. Family Theatre Corporation, supra; Bowman v. Gum, Incorporated, 1937, 327 Pa. 403, 193 A. 271 and Mercantile Library Hall Company v. Pittsburg Library Association, 1896, 173 Pa. 30, 33 A. 744. See also 114 A.L.R. 299–318.

9. In the Bayard case the officers of an insolvent Pennsylvania corporation caused a Delaware corporation to be organized, ostensibly to operate a spinning mill and invest in the operations of the Pennsylvania company. Although the latter was moribund, its earnings over the preceding three years were represented as having

been two and one-half times the dividend requirements of the Delaware corporation's 8% preferred stock. The Pennsylvania promoters, after taking a 20% commission out of the $172,000 raised on public sales of preferred stock, acquired control over the Delaware corporation by an exchange of stock and then sold it old machinery which had belonged to the Pennsylvania corporation. Shortly thereafter the latter went into receivership. The funds of the Delaware corporation had disappeared and it found itself owing large sums on notes given to the Pennsylvania corporation, its only asset being the second-hand machinery. The court properly held that the Delaware organization's minority stockholders, not having approved these transactions, had been defrauded and ordered the bill for an accounting brought against the directors to be reinstated.

See also Schmid v. Lancaster Avenue Theatre Co., 1934, 244 Pa. 373, 91 A. 363.

illustrates the absurdity of such a rule. At the time the arrangement was entered into it was to Catalyst's advantage because Mine Safety in taking over part of Jackson's time for its rebreather operation accepted responsibility for a proportionate share of his salary. That was important to Catalyst because of its currently weak financial status and because it helped keep Jackson available for it in the event it was decided that the hydrogenation catalyst was to be persevered with further. We are of the opinion that minority stockholders are abundantly protected in that kind of situation by the rule that the dominant interests must affirmatively establish the good faith and fairness of such transactions and we have been cited no pertinent authority to the contrary.

■ In conclusion, we are impressed by appellee's argument that Mine Safety, as the fiduciary corporation, not only was under no duty to its cestuis to permit them to share in its business opportunities, profits and inventions, but that such gratuities might well subject it to attack by its own stockholders. See Dodge v. Ford Motor Co., 1919, 204 Mich. 459, 170 N.W. 668, 3 A.L.R. 413.

The judgment will be affirmed.