## The Mercantile Library Hall Company, Appellant, *v.* The Pittsburg Library Association et al.

*Corporations—Notice of directors' meetings.*

In the absence of a by-law or a custom to the contrary at least one full day's notice should be given of a directors' meeting of a corporation.

Notice of a special meeting of the directors of a corporation was dated and mailed to the members of the board on January 2, and called for a meeting on January 3, at four o'clock. There was no evidence that the notices were received by the members before the morning of the day on which the meeting was fixed. There was no by-law nor custom as to the time within which the notice should be given. *Held*, that the notice was insufficient in time.

*Corporations—Directors' meetings—Special meetings—Notice.*

A special notice of a directors' meeting stated that the object of the meeting was " to hear the treasurer's report, and transact any other business which may come before them." The meeting was called for a Saturday which was the last business day that the board would be in existence, prior to the election of their successors at the stockholders' meeting on the following Monday. The impression which some of the members had from the notice was that the meeting was to be merely a formal meeting to pass on annual reports and similar matters of routine prior to the approaching stockholders' meeting. As a matter of fact the meeting was called to authorize a lease which practically divested the corporation of all its property and of all its active functions. *Held*, that the notice of the special meeting was insufficient to sustain the action of the directors in authorizing the lease.

*Corporations—Lease—Directors—Stockholders—Surrender of property and functions.*

A lease by a corporation which surrenders the control of all the company's property, divests the company of all its active functions, and practically winds up its existence, except for such formal continuance as may be necessary for the receipt and distribution among its stockholders of rentals under the lease, cannot be authorized by the directors, but only by the stockholders, in as much as such a lease is an accepted completion of the corporate purpose, and a consequent surrender of the corporate property, franchises and rights, which only the true owners themselves, the stockholders, are competent to make.

*Corporations—Mercantile Library Hall Company of Pittsburg—Act of March 18, 1859, P. L. 811.*

Under the act of March 18, 1859, P. L. 811, incorporating the Mercantile Library Hall Company of the city of Pittsburg for the purpose of erecting a hall for the use of a library association, and providing that the stockholders of the corporation should be paid the value of their stock when the hall was transferred to the library association, the stockholders of the hall company are entitled to keep the management of the property in their own hands until the terms of the act should be complied with, and they cannot be deprived of this right by any action of their board of directors not authorized at a stockholders' meeting.

*Corporations—Directors—Duties of persons who are directors of two corporations dealing with each other.*

While the same person may legally and properly act as director in two corporations even when such corporations are dealing with each other, the action of such person' should be open, and free from any suspicion of secret dealing in favor of one principal while acting as the representative of the other.

Argued Oct. 31, 1895. Appeal, No. 16, Oct. T., 1895, by plaintiffs, from decree of C. P. No. 1, Allegheny Co., March T., 1891, No. 962, on bill in equity. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Reversed.

Bill in equity for the cancellation of a lease.

The case was referred to W. B. Rodgers, Esq., as master, who reported the facts to be as follows:

#### FINDING OF FACTS.

I. This is a bill filed by the Mercantile Library Hall Company against the Pittsburg Library Association, Jos. Horne & Co., R. M. Gulick & Co., The Syria Temple, Jos. Albree, T. Brent Swearingen, Jas. F. Hudson and Wm. R. Thompson.

The object of the bill was to set aside a perpetual lease made to the Library Association of the ground and building of the Hall Company, situate in this city, which lease was executed by Albree as president of the Hall Company, under the authority, real or pretended, of a resolution of the board of managers of that company. Albree, Hudson and Thompson were members of the board of managers of the Hall Company. Swearingen was president of the Library Association, and executed the lease for that company. Horne & Co., Gulick & Co. and the Syria Temple were tenants of portions of the building.

II. On the 12th day of February, 1849, an act of assembly was approved (P. L. 59) incorporating the Young Men's Mercantile Library and Mechanics' Institute of the City of Pittsburg; the name was afterwards changed to that of the Pittsburg Library Association, and that corporation is the real defendant in this case, and will be referred to hereafter as the Library Association. The object of the corporation, as stated in the act, was "promoting and encouraging general information upon commerce, manufactures, and the mechanic and useful arts."

III. On the 18th day of March, 1859, an act of assembly was approved (P. L. 1860, p. 811) incorporating the Mercantile Library Hall Company, and that corporation is the plaintiff in this case, and will be referred to hereafter as the Hall Company. The object of the corporation, as stated in its act of incorporation, was to purchase land and erect thereon a suitable and commodious building for the use of the Library Association, the defendant, which building, with the ground on which it should be located, was, when ready for use, to be perpetually leased to the Library Association on terms and conditions defined in part, at least, by the act.

IV. On February 3, 1870 (P. L. 103), a supplement to the act incorporating the Hall Company was approved. Section 2 of the act provided that the Hall Company might lease the grounds and building to the Library Association on such terms and conditions as may be agreed upon between the respective corporations. Provided, that the rents and revenues received by the Library Association, in excess of the rent, taxes, interest, insurance and repairs shall be paid to the Hall Company to reimburse it for the cost of the ground and building, and provided, further, that if the Hall Company shall agree, the sur-

plus, receipts and revenues, and the increase in dividends arising therefrom may be appropriated to the purchase of stock in the Hall Company. This act is stated in the bill, as a part of the charter of the Hall Company, and seems to have been accepted.

V. The Hall Company erected a building as required by its act of incorporation, which building, from the time of its erection, has been occupied in part by the Library Association.

No lease was made upon the completion of the building, as provided by the act of 1859. It seems that the Library Association considered that it would be injudicious for it at that time to assume the obligations upon it in case such lease should be executed.

An agreement between the two corporations, dated March 10, 1871, was then prepared and executed by the officers of each, a copy of this agreement, marked exhibit A, is attached to defendant's answer.

By this agreement, the Library Association declared that as the net revenues of the building did not amount to a sum sufficient to pay taxes, repairs and interest on cost, and as there was in addition to the funded debt a considerable floating debt, it was therefore injudicious for it to assume the obligations of the lease, and therefore declined to do so, and on its part the Hall Company expressed its acquiescence in these views, and its willingness to retain possession for the purpose of better securing the final accomplishment of the design for the benefit of the Library Association.

It was therefore agreed that the Hall Company should retain possession, for the benefit of the Library Association, for the term of ten years from January 15, 1871, or until such further time as the floating debt of the company shall have been paid and the annual rents and revenues of the building, in excess of the expenses, shall reach six per cent per annum on the whole cost of the ground and building. The Hall Company was to keep an account of the receipts and expenditures, annually balance the accounts, and make no charge against the Library Association for any deficiency in the net amount of the revenues. There were also other provisions requiring the Hall Company to apply the revenues, in excess of expenses, to the payment of interest and the indebtedness of the company.

The duty of the Hall Company was stated in general terms

to " in all respects manage the property with a view to the earliest possible accomplishment of the object contemplated in the charter of the company." This agreement was by its terms to be subject to ratification by the stockholders of the Hall Company, but that was never obtained nor asked. The Hall Company, however, continued in possession and control of the building, leasing that portion of the building not occupied by the Library Association, and receiving the rents.

VI. The cost of the ground and building was $266,176.44, made up as follows :

| | |
|---|---|
| Construction account, . . . . | $234,176 44 |
| Ground, . . . . . . . | 32,000 00 |

Of the cost of the ground, $2,000 was paid in cash, and remainder was secured by a purchase money mortgage for $30,000, which is still unpaid. There was paid in on capital stock $104,142, and the remainder of the cost of the building was paid by loans, nearly all, if not all, of which was represented by mortgages.

At the time of the making of the agreement there was a funded debt, including the purchase money mortgage, of $160,000, and at or about that date the bills payable account amounted to $19,000 or $20,000. There are two dates, January, 1877, and April, 1886, when there were no bills payable outstanding, although at others there were such bills outstanding. The only detailed statement from the books, as to receipts and expenses, is for the year 1889, and shows the receipts for rent to be $24,541, and the expenses, including interest on the mortgage indebtedness, $16,539.96, balance $8,001.04.

VII. On January 2, 1891, a meeting of the board of directors of the Library Association was held, at which a proposition to be made in behalf of that association to the Hall Company for a perpetual lease from the company to the association of the entire building was adopted. This proposition, after reciting that the Library Association was desirous of obtaining possession and control of the building, offered to take a perpetual lease, as of January 1, 1891, of the building, and in consideration thereof pay all the taxes, insurance and necessary repairs, the interest on the mortgage indebtedness ($180,000) and also ($5,000) per annum towards the extinction of the first mort-

gage ($30,000), also an amount equal to four per cent per annum upon the par value of the stock of the Hall Company ($104,142), but, until the extinguishment of the first mortgage, the four per cent payment to depend upon the revenues realized, that is, that payment was only to be made if realized, and only to the extent realized from the rents and revenues, after making the other specified payments, the rents and revenues, over and above the rent, taxes, interest, insurance and repairs, to be paid as provided in the act incorporating the Hall Company and its supplements. This proposition was presented to, and accepted by, the board of directors of the Hall Company on January 3, 1891, and, on the same day, the perpetual lease in controversy was executed by the president of both corporations and acknowledged. The lease followed the term of the proposition as given above, excepting in this, that it bound the the Hall Company to pay the $5,000 payment coming due, which, under the proposition and acceptance, should be paid by the Library Association. At a regular meeting of the stockholders of the Hall Company, held on the 5th of January, 1891, resolutions were adopted denying the authority of the board to authorize the making of the lease, and that of the president to make it, and authorizing the new board, then elected, to take the necessary steps to cancel the lease. This bill was then filed.

VIII. Prior to the time at which the boards of the two corporations acted upon the proposition for lease, the officers of the Library Association were: T. Brent Swearingen, president; Jas. F. Hudson, Jos. Albree and Wm. R. Thompson, directors. The officers of the Hall Company were: Jos. Albree, president; L. H. Williams, treasurer; Wm. R. Thompson, secretary; Geo. I. Whitney, J. O. Brown, Henry Holdship and James F. Hudson, directors. There was a vacancy in the office of vice president, and one vacancy in the directorship in the latter company. The control of the affairs of the Hall Company was, by the bylaws, placed in the president, vice president, treasurer, secretary and five directors, and they, together, constituted "the board of managers." They were all required to be stockholders, and five members, all being notified, constituted a quorum.

Hudson, Albree and Thompson were members of both boards. Hudson was not a stockholder in the Hall Company, but had been duly elected as a director, and it seems to represent stock

which the Library Association held in the Hall Company. Thompson owned certain certificates, but was not a stockholder of record.

At a meeting of the directors of the Library Association at which the proposition to lease was adopted, and before its adoption, Hudson, Thompson and Albree resigned as members of the Library Association board.

The meeting of the managers of the Hall Company, at which the proposition to lease was accepted, was a special one, and held January 3, 1891, on the last business day of the term for which that board had been elected, although it was at first contemplated to hold the meeting some days earlier, but a later date was fixed in order to allow Mr. Williams more time to prepare his report as treasurer. The meeting was called by Thompson, the secretary; the notices were dated January 2, were in writing, and were mailed on the 2d to all the members.

The object of the meeting, as stated in the notices, was to hear the treasurer's report, and transact any other business which might come before the board.

The meeting was attended by Albree, Hudson, Thompson, Holdship and Williams, and they constituted a quorum. After reading the treasurer's report the proposition to lease was presented, and after some discussion, participated in by Mr. Williams, it was put to vote, and adopted by the votes of Albree, Hudson, Thompson and Holdship; Mr. Williams protested against the meeting and declined to vote, but participated in the discussion.

Notices of this meeting, as stated above, were mailed to all of the managers, but Whitney was at that time and for some days previous, in New York, and did not have any personal knowledge of the meeting, prior to its being held, and would, if he had been present, have probably opposed the acceptance of the proposition.

The by-laws are silent as to the notice to be given to meetings of the managers, and there seems to have been no rule of practice on the subject, there being but few meetings held, and they were not fully attended, although so far as there was any practice on the subject, notices were sent by mail, a day or two prior to the meetings.

The managers were all well known business men of this city,

and the place of meeting was convenient and central. Whitney's office was on Fourth avenue, and the notice of the meeting was received there.

IX. There was no fraud on the part of Albree, Hudson, Thompson or Swearingen.

The master recommended that the bill should be dismissed.

Exceptions to the master's report were overruled, and a decree entered dismissing the bill.

*Error assigned* among others was decree dismissing the bill.

*J. F. Sanderson* and *P. C. Knox,* of *Knox & Reed, Walter Lyon* and *Chas. H. McKee* with them, for appellant.—The general power to perform all corporate acts, refers to the ordinary business transactions of the corporation, and does not extend to the reconstruction of the body itself, or to the enlargement of its capital stock: R. R. v. Allerton, 18 Wall. 233; Baker's App., 109 Pa. 461; Metropolitan R. R. v. Manhattan Ry., 15 Am. & Eng. R. R. Cases, 1.

In order to guard against and prevent surprise, notice must be given a reasonable time before the hour of meeting, and what is a reasonable time, of course depends upon the circumstances of the case: Angell & Ames on Corporations, sec. 464.

The notice should state the business to be transacted: Angell & Ames, sec. 481; Atlantic DeLaine Co. v. Mason, 5 R. I. 463; Gordon v. Preston, 1 Watts, 385; Kersey Oil Co. v. Oil Creek R. R., 12 Phila. 374; Pike County v. Rowland, 94 Pa. 238; Everhart v. Searle, 71 Pa. 256.

*Johns McCleave, D. T. Watson* and *A. M. Neeper* with him, for appellee.—To all intents and purposes the directors, acting in their own corporate capacity, are the corporation itself. Their powers, unless expressly restrained by statute or by by-law, are the powers of the corporation. They are not the agents of the shareholders, but the agents of the corporation, and derive all their authority from the charter. They are the organic agents established by the legislature. Their powers are delegated by the corporation and not by the stockholders. Dana v. Bank of the United States, 5 W. & S. 246; Ardesco Oil Co. v. North American Oil & Mining Co., 66 Pa. 375; Ahl v. Rhoads,

84 Pa. 319; Shaw v. Norfolk County R. R., 16 Gray, 47; Pierce on Railroads, 32; 2 Redfield on Railways, 136; Green's Brice's Ultra Vires, 489; 1 Wood's Ry. Law, sec. 153; Taylor on Corporations, sec. 224; Beveridge v. N. Y. Elevated R. R., 112 N. Y. 1; Leggett v. N. J. Mfg. & Banking Co., 1 N. J. Eq. 552; Dayton & Cincinnati R. R. v. Hatch, 1 Disney's Rep. 84; Hodder v. Kentucky & Great Eastern Ry., 7 Fed. 793; Jones on Railroad Securities, sec. 84; Manchester Iron & Steel Co., 9 Fed. Rep. 640.

The notice calling the meeting stated that it was for the purpose of hearing the report of the treasurer and the transaction of such other business as might be brought before the meeting. This notice according to the uniform practice in calling such meetings, was certainly sufficient: Savings Bank of New Haven v. Davis, 8 Conn. 191; Argus Co.'s Petition, 138 N. Y. 557; Wills v. Murray, 4 Exch. 843; Hoyt v. Thompson, 19 N. Y. 207.

Leaving notice of meeting at business place of director is sufficient even though he be known to be sick: Corbett v. Woodward, 5 Sawyer, 303.

Notice by mail is sufficient: Covert v. Rodgers, 38 Mich. 363; People v. Albany College, 26 Hun, 348.

Meeting of the directors was valid, though two of them being absent from the state did not receive the notice: Chase v. Tuttle, 55 Conn. 55.

It is admitted that all of the directors of the Hall Company lived either in Pittsburg or in Allegheny; and it is admitted that the directors had notice probably twenty-four hours in advance, certainly as much as twelve hours. This was certainly abundance of time to allow any resident of either city to attend at the place where the meeting was called.

Even if the two corporations are to be considered as having directors in common, it does not avoid the transaction, but only makes it voidable upon the ground of fraud. If the transaction was made in good faith, and was not a wrong upon the stockholders of the Hall Company, then it is immaterial how many directors the two companies had in common: Gloninger v. P. & C. R. R., 139 U. S. 13; Rolling Stock Co. v. Atlantic & Great Western Ry., 34 Ohio, 450.

OPINION BY MR. JUSTICE MITCHELL, January 6, 1896:

This is a regrettable controversy between two corporations occupying to each other practically the position of trustee and cestui que trust, both having the same end and object in view, but differing in opinion as to the time and mode of accomplishment. By the action of the trustee's agent, its former board of managers, the corpus of the trust has been transferred to the hands and management of the cestui que trust, and while this result is in accord with the purpose of the trust, the trustee complains that it has been done without proper authority, and without due regard for the trustee's own rights and interests. We are obliged to say that this complaint is well founded.

The notice for the special meeting of the Hall Company at which this lease was authorized was insufficient both in time, and in substance. It was dated and mailed to the members of the board on January 2, and called for a meeting on January 3, at four o'clock. There is no finding by the master as to the hour of mailing nor any evidence that the notices were received by the members before the morning of the day on which the meeting was fixed. Prima facie this was not a reasonable time. The managers are all reported as business men, who cannot be presumed to be ready to drop their own affairs and attend off hand on such a notice. One full day in advance of the time fixed is as little as the law could presume to be reasonable, and in many cases that would be too short. The by-laws or the practice of the particular board could of course fix any time that should be agreed upon, but there is no by-law here, and no sufficient evidence of any practice to supply a rule. Albree, the president, says it was customary to give two or three days' notice, and Thompson the secretary says that to the best of his knowledge two days' notice was given in this instance, in which he is admittedly in error.

The notice further was insufficient in substance. It was for a special meeting, with a definite object named, "to hear the treasurer's report," and the few general words added "and transact any other business which may come before them." It was for a meeting on the last business day that the board would be in existence, prior to the election of their successors at the stockholders' meeting on the following Monday, and was calculated to convey the impression which Whitney says Williams

complained of, that it was a formal meeting to pass on annual reports and similar matters of routine, prior to the approaching stockholders' meeting.   In fact however it was called for business of the most important and most exceptional character, involving the practical surrender of the active duties of the corporate trust.

The meeting thus irregularly called was equally unfortunate in its attendance.   The full board of managers consisted of the four principal officers of the Hall Company and five directors, making nine, of whom five were a quorum.   By reason of two vacancies at that time there were only seven managers, one of whom, Whitney, did not get the notice in time, and another of whom, Brown, did not attend, for reasons not explained.   This left an attendance of a bare quorum of five persons, of whom the master reports that one was not a stockholder, and therefore not legally qualified to be a director, and another was not a stockholder of record though he appears to have held some certificates.   These two whose titles were at least questionable, and one other, making a majority of the quorum, knew all about the special business to be put through, for as directors of the Library Association they had been active in having the lease prepared by counsel, and adopted by the association at its meeting on the previous day.   It is true that they had on that day resigned as directors of the Library Association, so that at the meeting of the Hall Company on January 3 they no longer technically occupied the positions of directors in both companies, but it cannot be pretended on the evidence that these resignations were not mere formalities in order better to carry out the plan of leasing which prior to such resignations the same persons in their other capacities had prepared.   The practical result was that when the board of managers of the Hall Company met on January 3 to consider the lease, three of the quorum present as representatives of the lessor were already committed to the lease in the interests of the lessee, and the vote of these three made the majority by which the lease was approved. The master finds that in this action there was no fraud in fact, and we see no reason to question the correctness of this finding. The gentlemen concerned had no pecuniary interest in the matter and were acting for the benefit of the Library Association, which as already said was the cestui que trust for which this

building was originally designed, and to which it was ultimately to go. But the mere statement of the facts is enough to show that the method of proceeding is open to most serious objection.

By this it is not meant to be intimated that the same person may not legally and properly act as director in two corporations, even when dealing with each other. The interests of corporations are sometimes so interwoven that it is desirable to have joint representatives in their respective managements, and at any rate it is a not uncommon and not unlawful practice. But the action of such persons should be open, and free from any suspicion of secret dealing in favor of one principal while acting as the representative of the other. Such action is always open to investigation, and the utmost good faith must not only exist but be made manifest. In the present case we are not required to say whether or not the transaction is so contrary to settled policy that it must be conclusively pronounced a fraud in law, as there are other grounds which are decisive. Before leaving this branch of the case however we may call attention to the difference in Gloninger v. R. R. Co., 139 Pa. 13, cited by appellee, in that the issue of bonds in that case was for payment of an undisputed debt, and was authorized by a vote of the stockholders themselves.

But the lease in controversy here is fatally defective for want of authority in the board of managers to grant it. While the object of the incorporation of the Hall Company was to build a hall for the use of the Library Association, and to lease it and ultimately to convey it to that association, yet the act of 1859 looked to the payment of the stockholders of the Hall Company, and defined with great precision the respective rights of all the parties, including the terms of the contemplated lease. The supplementary act of 1870 relieved the stringency of the former act somewhat as to the terms of the lease, by authorizing it under certain restrictions to be made upon mutual agreement. But it made no substantial change in the rights of the stockholders, and it is not clear how it could have done so without their consent. The act however seems to have been acquiesced in, as a lease for ten years was made under its authority in 1871, and appears to have been lived under until the action that led to the present controversy in 1891. The present lease does not follow the terms of the act of 1859. It is not neces-

sary to go into the discussion of the variations further than to say that by the act of 1859 the Library Association, on taking possession under the lease provided for, was to pay to the Hall Company annually the necessary repairs and taxes, " and in addition thereto a sum not over six per cent per annum on the whole cost of said ground and building," while under the lease of 1891 the payment is to be four per cent, and that dependent on a surplus of income from rents etc. after payment of taxes, repairs and interest on incumbrances.   As these last are nec- essarily preferred claims, it may well be that the stockholders of the Hall Company would get a larger return under the lease, provided the Library Association is able to keep its covenants, than they would under their own management, but under the act of 1859 they were entitled to keep the management of the property in their own hands until the terms of the act should be complied with, and this was a right of which they could not be deprived except by such compliance, or by their own con- sent.   The lease in question surrenders the control of all the company's property, divests the company of all its active func- tions, and practically winds up its existence except for such formal continuance as may be necessary for the receipt and dis- tribution among its stockholders of such payments as the Li- brary Association shall hereafter make.   Such an act is not in the management of the current affairs of the company, but is extraordinary and practically final.   It cannot be fairly regarded as within the authority committed to the board of directors, but rather as an accepted completion of its corporate purpose and a consequent surrender of its property, franchises and rights which only the true owners themselves, the stockholders, were competent to make.

At the close of respondent's answer, there were some rather irregular averments that the objections of the present managers of the Hall Company, and the action of the majority of the stockholders, are for selfish aims, and with a view to their own profit rather than to the interests of the Library Association. These we understand to have been stricken out by the court below as impertinent, and they have not been considered as part of the case before us.   They are mentioned now only to make this fact clear.   The object of the Hall Company's cor- porate existence was to promote the interests of the Library

Association. It is a trustee for that purpose and bound to act in the utmost good faith to that end. Should it at any time fail to do so, the courts of equity are open to the cestui que trust for redress, and this adjudication will not be in the way.

Decree reversed, bill reinstated and decree directed to be made restoring parties to their respective positions before the lease of January, 1891, was made, but saving intervening rights of tenants who have paid rents, and others.