CHARLES L. BURKHART, Trustee, *v.*
JAMES E. SMITH.
[No. 32, October Term, 1931.]

*Decided December 4th, 1931.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, and SLOAN, JJ.

*Harry D. Kaufman*, with whom were *Moses W. Rosenfeld* and *Julius Novey* on the brief, for the appellant.

*Rignal W. Baldwin*, Jr., with whom were *William D. Macmillan, William H. Price, Jr.*, and *Semmes, Bowen & Semmes*, on the brief, for the appellee.

BOND, C. J., delivered the opinion of the Court.

Charles L. Burkart, trustee in bankruptcy of the Chesapeake Waste Paper Company, filed a bill in equity charging James E. Smith, owner of eighty per cent. of the stock, director and president of the company, with having fraudulently and negligently wasted its assets by deliveries made and indulgences granted to a Marley Paper Manufacturing Company, of which Smith was likewise the chief stockholder, owning ninety per cent. of the stock, a director and its presi-

dent. And it was prayed that he might be required to repay the resulting losses, for the benefit of the creditors of the Chesapeake Company. The court failed to find in the evidence sufficient support for the charges of misconduct, and dismissed the bill; and the complainant has appealed from that action. The controversy is almost altogether on the question of fact decided.

Smith caused the Chesapeake Company to be incorporated in 1917, and engaged it in the business of collecting and selling waste paper; and he was, in fact, the managing and directing head of the business. The Marley Company he formed in 1918, and he engaged it in the manufacture of paper board from waste paper. Thereafter the two companies worked in conjunction, the Marley Company taking the greater part of the output of the Chesapeake Company at the market price of waste paper. This arrangement with a single consumer for such a large part of the output, Smith testified, should have been an economically advantageous one for the waste paper company, as it afforded an assured outlet for its product and dispensed with the need of agents to seek sales elsewhere about the country. The Marley Company bought an additional supply in Philadelphia. But the Marley Company was unsuccessful, and was adjudicated a bankrupt; and at the time of the adjudication it owed the Chesapeake Company a total of $134,934.37 for shortages of payments for waste paper purchased, and had only $390 of assets available for unsecured creditors.

The Chesapeake Company started with a small capital, which, by the year 1925, it had increased out of earnings to $30,000. Smith did not take any salary or dividends. In 1925, the Marley Company became insolvent because of inventory losses previously sustained, and compromised with its creditors, of which the Chesapeake Company was one, by payments of twenty per cent. of the amounts of their debts. Chesapeake Company dividends due to Smith and two associates as directors, Mr. Tschudi and Mr. Dew, $9,880 in all, were turned back to the company and applied to repayment of the loss on the settlement with the Marley Company.

The Marley Company then started afresh, and regularly sold its entire output after 1925 through a La Boiteaux Company of Cleveland as exclusive sales agent. The La Boiteaux Company lent the Marley Company, up to the year 1928, a total sum of $35,000. During this period the La Boiteaux Company was urging that the business and output of the Marley Company be enlarged. And one of the most significant facts in the case is that bankers and other lenders, and machinery manufacturers, almost at the end of the career of the Marley Company, gave it large credits, knowing its financial condition exactly, but apparently confident of its success upon an enlargement of its business as urged. In 1925, at the suggestion of the La Boiteaux Company, the Marley Company concentrated upon the manufacture of sheet board, and made a profit for a short period, but competition reduced the profits, and the company continued to fall in debt to the Chesapeake Company. Smith then, and throughout the subsequent careers of the two companies, sought repayment for the Chesapeake Company, and also a continuous profitable outlet for it, by centering his efforts on promotion of the prosperity of the Marley Company. And in doing it he continued from year to year to use more of the output of the Chesapeake Company than the Marley Company could, in the end, pay for. Other employees of the Chesapeake Company demurred to this proceeding at times, especially in the last year of dealings, but Smith directed that the Marley Company's orders be filled. The other directors appear to have concurred in the effort Smith was making. No formal meetings of directors were held after 1927; there were only informal consultations among them. In 1926 or 1927, a leading board mill engineer was called in for his advice on the development of the Marley Company's business, and he confirmed a plan Smith had in mind, that of adding to the machinery and making heavier board. The machinery was obtained from the Westinghouse Company, upon a conditional sale, after the treasurer of that company had investigated the plant and its prospects. The machinery was installed in 1928. In that same year, the Maryland Trust Company, after an ex-

amination of the condition of the company had been made by its president, lent the Marley Company $75,000, upon the security of a mortgage on its property and a guarantee of the mortgage debt by Smith. And, in addition, Smith lent between $90,000 and $100,000 of his own in scattered amounts, $2,000 of it shortly before the company was adjudicated a bankrupt.

But as has been stated, the expectations of these creditors were not realized, and the Marley Company sank more and more deeply into indebtedness to the Chesapeake Company for unpaid portions of the purchase price of waste paper bought. The amounts of purchases from the Chesapeake Company, and of the payments, as well as the amount of indebtedness of the Marley Company from year to year, were given in evidence, but the figures as printed in the record do not all agree. Starting with an indebtedness of the Marley Company of $739.81 in the year 1922, in 1923 this was, according to the record, increased to $13,082.85, in 1924 to $13,117.35, in 1925 to $15,031.66, in 1926 to $26,277.37, in 1927 to $43,928.75, in 1928 to $93,966.18, and in 1929 to $134,943.37. The figures given of sales and payments during those years are: In 1922, sales $13,406.02 and payments $14,750; in 1923, sales $33,708.80 and payments $21,365.75; in 1924, sales $34.50, and no payments; in 1925, sales $26,038.78 and payments $24,124.46; in 1926, sales $60,651.54 and payments $36,404.70; in 1927, sales $45,169.56 and payments $27,518.18; in 1928, sales $131,-363.87 and payments $81,326.44; and in 1929, sales $82,-122.59 and payments $41,154.90. The failure of the expectations is explained in the defendant's testimony as due to unusually bad failure in market conditions. It was not contended that Smith ever derived any profit for himself out of the dealings of these corporations; on the contrary it appears established that he received neither salary nor dividends, and lost large sums of his own funds which he had advanced to the companies, principally to the Marley Company, in his efforts to make both profitable.

The result of these facts seems to be that Smith, with no motive except to rescue and make profitable his double enterprise, sent good money after what proves to have been bad money, and as part of the good money a considerable margin of assets of the Chesapeake Company, in the shape of raw material, repayment for which, if obtainable, would be the only source of payment for the creditors of the Chesapeake Company. As the evidence has turned out, it is clear, not only that Smith was merely seeking the benefit of the companies, and acting upon judgment based upon his expectations of strengthening the Marley Company and rendering it able to pay its indebtedness, but it is clear, too, that his expectations and judgment were studied at the time and concurred in by experts and a banker, who were interested only in obtaining, from the Marley Company's future business, payment of a profit for additional indulgences to it. No fraud on Smith's part appears. Bad judgment, and partial judgment, there may have been in his risking so much of the Chesapeake Company's assets, along with assets of his own and of others, upon the prospects of the Marley Company, but such bad judgment, upon those prospects as he and others saw them, would not, in our opinion, afford ground for a decree in equity compelling him to repay the losses to the Chesapeake Company.

Smith was in the position of a trustee or agent of the Chesapeake Company, and his liability, if any, must rest upon a finding of waste of the assets by what has been described as "fraud or malfeasance, or such gross negligence as may amount to a breach of trust," "by gross negligence and inattention to the duties of their trust," or by failure to exercise " 'the same degree of care and prudence that men prompted by self-interest generally exercise in their own affairs under like circumstances." *Booth v. Robinson,* 55 Md. 419; *Fisher v. Parr,* 92 Md. 245, 264, 48 A. 621, 623; *Gill v. Ash,* 124 Md. 612, 619, 93 A. 210, 212. The measure of care and prudence required can hardly be defined accurately, and so as to furnish the solvent for all controversies in particular cases of complaints against officers and direc-

tors. It is plain, however, that the law does not make an officer or director liable to repay losses caused by any and every departure from what the court, after the event, might consider to be good judgment. There must be something more. If there is no conscious betrayal of the trust reposed, there must be such neglect or misconduct as amounts to a betrayal of the trust. And we concur with the judge of the lower court in his finding that the facts presented in this case do not justify a finding of either fraud or negligence, or misconduct of the kind described.

*Decree affirmed, with costs to the appellee.*