**HIRSHHORN v. MINE SAFETY APPLI-. ANCES CO. et al.**

Civ. A. No. 2811.

United States District Court
W. D. Pennsylvania.

Aug. 15, 1952.

See also 101 F.Supp. 549.

John B. Doyle, E. A. McGuire, New York City, Walter M. Newman, Pittsburgh, for plaintiff.

Charles E. Kenworthey, Paul E. Hutchinson, Gilbert Helwig, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for defendants.

STEWART, District Judge.

Plaintiff, a stockholder in Carbon Monoxide Eliminator Corporation, brought this action on his own behalf and on behalf of other stockholders of Carbon Monoxide Eliminator Corporation to require an accounting of profits allegedly diverted from Carbon Monoxide Eliminator Corporation and Catalyst Research Corporation to the Mine Safety Appliances Company. The individual defendants are various participants in this alleged diversion of profits. By reason of the ownership by Carbon Monoxide Eliminator Corporation of stock in Catalyst Research Company, this action constitutes a double derivative stockholders' action in addition to an ordinary single derivative action. The case was tried without a jury, and upon all the evidence, we make the following

Findings of Fact

I.

The Parties and Their Relationship to Carbon and Catalyst.

1. Plaintiff, Joseph H. Hirshhorn, is a resident of New York and has been a stockholder of Carbon Monoxide Eliminator Corporation (hereinafter referred to as "Carbon") from 1931 to date.

2. Carbon is a Delaware corporation; Catalyst Research Corporation (hereinafter referred to as "Catalyst") a Maryland corporation; Mine Safety Appliances Company (hereinafter referred to as "Mine

Safety") a Pennsylvania corporation; all have offices for the transaction of business in Pittsburgh, Allegheny County, Pennsylvania, and transact business in Pittsburgh, Allegheny County, Pennsylvania; the individual defendants are all residents of Allegheny County, Pennsylvania.

3. Mine Safety was organized in 1917 by George H. Deike and John T. Ryan, Sr. as successor to the partnership of Deike and Ryan. From the time of its organization to date, it has engaged extensively in the business of developing and manufacturing industrial and military safety equipment and devices of both a mechanical and chemical nature.

4. In 1928, Mine Safety became associated with J. H. Newmark in the financing of chemical research then being conducted by J. C. W. Frazer of Johns Hopkins University in the development of means for the elimination of carbon monoxide from exhaust gases from internal combustion engines. In the furtherance of this joint project, Mine Safety and Newmark secured the assignment to them of various patents and acquired from Frazer an exclusive license to use certain catalyst and treatment inventions of Frazer for use in a device for the treatment of exhaust gases and "for no other purpose whatsoever".

5. In 1929, Carbon was organized as a successor to said enterprise initiated by Mine Safety and Newmark and there were transferred to Carbon all of the contracts, agreements, patents and other rights acquired by them including the limited license acquired from Frazer.

6. The assets thus transferred to Carbon were valued on its books of account at $400,000 and in exchange therefor shares of the capital stock of Carbon were issued to Newmark and Mine Safety. Subsequently, Mine Safety acquired additional shares of Carbon stock for cash and at all times material to this action owned a majority of the outstanding stock of Carbon.

7. In May of 1930, Catalyst was organized for the primary purpose of developing and exploiting the catalyst invented by Frazer in uses other than the treatment of exhaust gases from internal combustion engines (which use Frazer had theretofore licensed to Carbon); and for the purpose of developing and exploiting other inventions pertaining to catalysts and their uses. Under the plan of organization, 40 per cent of the stock of Catalyst was acquired by Frazer in exchange for a license to use his inventions, and 60 per cent was acquired by Carbon pursuant to an agreement by which Carbon undertook to advance to Catalyst $50,000 in annual installments of not less than $10,000.

8. a. George H. Deike was at all times material hereto a director of Mine Safety, Carbon and Catalyst and was president of Catalyst. He was also president of Mine Safety except for a period between 1939 and 1941.

b. William P. Yant was president and a director of Carbon from January, 1937 to June of 1942. Yant, though not an officer or director of Mine Safety, has been Director of Research at Mine Safety since 1936. Yant became vice president of Catalyst in 1942.

c. John F. Beggy has at all times material hereto been an officer of Mine Safety and was a director of Mine Safety from 1935 to 1943. Beggy was an officer of Carbon from 1931 to 1943 and a director from 1933 to 1943. Beggy was an officer of Catalyst from 1933 to 1943 and a director of Catalyst in 1942 and 1943.

d. John T. Ryan, Sr. was an officer and director of Mine Safety from its organization until his death in February, 1941. Ryan, Sr. was president of Carbon from 1931 through 1936, and a director of Carbon from its organization until his death in 1941. He was vice president and a director of Catalyst from 1933 until his death in 1941.

e. John T. Ryan, Jr. was a director of Carbon from September, 1941 to July, 1942. Ryan, Jr. was an officer of Mine Safety from 1937 to 1943 and a director of Mine Safety from April, 1941 through 1943. He has been General Manager of Mine Safety since 1941. He has never been an officer or director of Catalyst.

f. W. Denning Stewart has been a director of Carbon since August, 1942. He

was president of Carbon from 1943 to 1950.

g. Howard Zacharias has been a director of Carbon since 1931 and a director of Mine Safety since 1929.

9. At all times material hereto, Mine Safety had potential and practical control of the affairs of Carbon and Catalyst through the majority stock ownership of Mine Safety in Carbon, and of Carbon in Catalyst, and through interlocking directorates.

10. At all times material hereto, there was independent representation of minority stockholders on the Boards of Directors of both Carbon and Catalyst.

## II.

### Alleged Neglect and Mismanagement by Defendants of the Affairs of Carbon and Catalyst.

11. From the time of its organization, Carbon has been exclusively concerned with the attempt to develop a commercially feasible device for the elimination of carbon monoxide from the exhaust gases of internal combustion engines.

12. Mine Safety and the individual defendants in control of or charged with responsibility for the management and direction of the business and affairs of Carbon have at all times employed all reasonable means and taken all available opportunities for the development of the carbon monoxide eliminator.

13. Because of the inability to develop a suitable catalyst or injector, both of which are essential to a safe and efficient eliminator, efforts to develop a commercially feasible carbon monoxide eliminator have been unsuccessful.

14. Neither the individual defendants nor Mine Safety derived any profits from the failure to develop and market a carbon monoxide eliminator.

15. In connection with their research upon the carbon monoxide eliminator, Carbon employees perfected and patented a chemical compound known as the 1-1-1 catalyst. This patent was assigned to Carbon.

16. A limited market for the use of the 1-1-1 catalyst apart from its use in a carbon monoxide eliminator has been shown to have existed .

17. Mine Safety and the individual defendants in control of or charged with responsibility for the management and direction of the business and affairs of Carbon have at all times employed all reasonable means and taken all available opportunities for the exploitation and marketing of this catalyst in uses apart from the carbon monoxide eliminator.

18. Neither the individual defendants nor Mine Safety derived any profit from the failure further to develop a market for 1-1-1 catalyst in uses apart from the Carbon monoxide eliminator.

19. In managing and directing the affairs of Carbon, the defendants in control of or charged with the responsibility therefor acted in good faith and with that diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in their personal business affairs.

20. From the time of its organization until 1938, Catalyst engaged solely in the business of catalytic research, principally in the development of an improved catalyst for the hydrogenation of vegetable oils.

21. In the summer of 1936, research upon the hydrogenation catalyst had been completed and the erection of a pilot plant for the manufacture of the catalyst for commercial purposes was under consideration. By the end of 1938, it was determined that the commercial production of the hydrogenation catalyst was not practicable and the project was abandoned by decision of the officers and directors of Catalyst.

22. At all times material hereto Mines Safety and the individual defendants in control of or charged with the responsibility for the management and direction of the affairs of Catalyst employed every reasonable means and took all available opportunities for the development and exploitation of the hydrogenation catalyst.

23. Neither the individual defendants nor Mine Safety derived any profit from the failure to develop a market for the hydrogenation catalyst.

24. In the course of the experimentation upon the hydrogenation catalyst in Baltimore, Drs. Bennett and Frazer developed and patented an invention known as the mercury nickel disc which could be used to detect the presence of certain gases. This patent was assigned to Catalyst.

25. At all times material hereto Mine Safety and all individual defendants in control of or charged with responsibility for the management and direction of the affairs and business of Catalyst have employed all reasonable means and taken all available opportunities for the exploitation and development of commercial applications of the mercury nickel disc.

26. Neither the individual defendants nor Mine Safety derived any profit from the failure further to exploit and develop commercial applications for the mercury nickel disc.

27. Between 1936 and 1939, as a result of his observation of certain hand methods used in the Mine Safety plant, Dr. Bennett devised a machine to fill and seal glass vials or ampoules semi-automatically. The machine contained certain features which were patented and the patent was assigned to Catalyst.

28. An experimental machine based upon Bennett's design was built at the expense of Mine Safety and used experimentally over a period of two years. The machine never operated satisfactorily and its further use was abandoned and the hand method resumed. No effort was made to develop and exploit an outside market for this machine.

29. The failure to develop and exploit a market for the ampoule sealing machine did not constitute any breach of duty to Catalyst on the part of Mine Safety or the individual defendants in control of or charged with responsibility for the management and direction of the affairs and business of Catalyst.

30. Neither the individual defendants nor Mine Safety derived any profit from the failure to develop and exploit a market for the ampoule sealing machine.

31. In managing and directing the affairs of Catalyst, the defendants in control of or charged with the responsibility therefor acted in good faith and with that diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in their personal business affairs.

III.

Intercompany Transactions between Mine Safety, Carbon and Catalyst.

32. All of the intercompany transactions complained of occurred in Pennsylvania.

33. The use by Mine Safety of the 1-1-1 catalyst in the inert gas machine was authorized by the proper officers of Carbon and approved and ratified by the directors and stockholders.

34. The sum equal to ten per cent of the selling price of the inert gas machine paid by Mine Safety for the use of the 1-1-1 catalyst therein was fair and reasonable to Carbon.

35. The use byMine Safety of the 1-1-1 catalyst in the hydrogen eliminator was authorized by the proper officers of Carbon pursuant to express authority given by the directors and shareholders of Carbon.

36. The sum equal to ten percent of the selling price of the hydrogen eliminator paid by Mine Safety for the use of the 1-1-1 catalyst therein was fair to Carbon.

37. The use by Mine Safety of the 1-1-1 catalyst in the inert gas machine and hydrogen eliminator and the compensation paid therefor were fair and to the best interests of Carbon. These transactions were made in good faith and involved no breach of duty by any defendant.

38. The use by Mine Safety of the Catalyst patents in the densiometer and leak detectors was authorized by the proper officers of Catalyst and approved by its directors.

39. The sum equal to ten per cent of the selling price of the densiometers and leak detectors paid by Mine Safety for the use of the Catalyst patents therein was fair to Catalyst.

40. The use by Mine Safety of the Catalyst patents in the densiometers and leak detectors and the compensation paid therefor were fair and in the best interests

of Catalyst. These transactions were made in good faith and involved no breach of duty by any defendant.

41. Mine Safety never used the ampoule sealing machine except experimentally and derived no profits from its use.

42. The challenged transactions and dealings between Mine Safety and Carbon or Catalyst which involved the use by Mine Safety in its products of patented processes, devices and chemicals of Carbon or Catalyst were entered into in good faith, were to the best interests of Carbon or Catalyst and were fair.

43. Mine Safety's utilization of the services of Dr. Bennett in connection with Mine Safety projects was pursuant to an arrangement under which Mine Safety, Carbon and Catalyst were operating between 1935 and 1940 by the terms of which these corporations shared the services of Dr. Bennett, each being severally responsible for his salary for work performed by him for each.

44. The use of Bennett's services by Mine Safety and the practice under which his salary was allocated among the corporations were fair and to the best interests of Carbon and Catalyst.

45. In April, 1935, Catalyst employed Dr. Carey B. Jackson as a research chemist. This contract of employment was entered into and executed in Pennsylvania.

46. Between 1935 and 1940, the services of Dr. Jackson were utilized from time to time in connection with projects of Mine Safety pursuant to an arrangement between Catalyst and Mine Safety under the terms of which these corporations shared the services of Jackson, each being severally responsible for his salary for the work he did for each.

47. The use of Dr. Jackson's services by Mine Safety and the practice under which his salary was allocated between the corporations were fair and to the best interests of Catalyst.

48. The challenged transactions and dealings between Mine Safety and Carbon or Catalyst which involved the sharing of employees or the utilization of their services and the system of allocating charges for the salaries of such employees were entered into in good faith, were to the best interests of Carbon and Catalyst and were fair.

49. In the spring of 1936, Jackson was employed by Mine Safety to assist its Sales and Engineering Departments in the development of an oxygen indicator. An unpatented device known as the Jackson Carbon Dioxide Indicator was developed and sold to the Navy in small quantities.

50. While working on the carbon dioxide indicator, Jackson was in the employ of Mine Safety.

## IV.

### Ownership of the Rebreather Patents of Dr. C. B. Jackson

51. In September, 1936, Yant, as Director of Research of Mine Safety, hired Dr. C. B. Jackson to join the Mine Safety research staff to undertake research and experimentation on a rebreather apparatus which Mine Safety was developing.

52. Mine Safety successfully developed a rebreather using an oxygen-evolving chemical and thereafter furnished quantities of these devices to the Navy under production contracts. It is now selling such devices commercially.

53. While working on the rebreathers, Jackson was in the employ of Mine Safety.

54. While working on the rebreather Jackson conceived and perfected certain inventions upon which he obtained patents, all of which were assigned by him to Mine Safety.

55. In May, 1935, Jackson executed a covenant to assign to Catalyst inventions discovered by him in connection with the business of Catalyst.

56. At all times when Jackson worked on Mine Safety projects, he had expressly or impliedly agreed to assign inventions discovered in connection therewith to Mine Safety.

57. While working on the rebreather Jackson was engaged in the business of Mine Safety.

58. Jackson's inventions used in the rebreather were "invented or discovered in

connection with the business" of Mine Safety.

59. Jackson's inventions used in the re-breathers were not "invented or discovered in connection with the business" of Catalyst.

## Conclusions of Law

### I.

### The Parties and Their Relationship to Carbon and Catalyst

1. This Court has jurisdiction of this action under Section 1332 of Title 28 of the United States Code by virtue of the diversity of citizenship of the parties.

2. In determining what law governs the transactions complained of in this case, this Court must apply the rules of conflict of laws of Pennsylvania. Klaxon Company v. Stentor Electric Manufacturing Co., Inc., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477; Steckler v. Pennroad Corporation, 3 Cir., 1943, 136 F.2d 197.

3. Since the relief sought in this case is the imposition of liability upon Mine Safety and present and former directors of Carbon and Catalyst for alleged wrongdoing and an accounting for diverted profits from and consequent losses to Carbon and Catalyst, it follows that the instant suit does not involve the management or control of the internal affairs of Carbon or Catalyst, both of which are foreign corporations. Overfield v. Pennroad Corporation, 3 Cir., 1940, 113 F.2d 6; Loan Society v. Eavenson, 1913, 241 Pa. 65, 88 A. 295.

4. Since the intercompany transactions complained of took place in Pennsylvania, the law of Pennsylvania governs. Mike v. Lian, 1936, 322 Pa. 353, at page 355, 185 A. 775. See concurring opinion of Judge Jones in Overfield v. Pennroad Corporation, 3 Cir., 1944, 146 F.2d 889, at page 900. However, with respect to the standard of care, skill and diligence required of those defendants who were directors of Carbon and Catalyst the law of Delaware and Maryland, respectively, governs. Otis & Company v. Pennsylvania R. Co., E.D.Pa.1945, 61 F.Supp. 905, at page 912 affirmed 3 Cir., 1946, 155 F.2d 522. As indicated by the cases cited in connection with conclusion of law No. 7, this standard is substantially the same in the three states here involved. See 3 Fletcher, Cyclopedia Corporations (1947 Ed.) § 1037.

5. Where, as here, the interests of different corporations are closely interwoven, it is not unlawful to have interlocking directorates and control. Bowman v. Gum, 1937, 327 Pa. 403, 193 A. 271; Mercantile Library Hall Co. v. Pittsburgh Library Ass'n, 1896, 173 Pa. 30, 33 A. 744.

6. Mine Safety by reason of its control of Carbon and Catalyst, through interlocking directorates and majority stock ownership, owed to Carbon and Catalyst and their shareholders the same fiduciary obligations as were owed to these corporations by their respective directors. Pepper v. Litton, 1939, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281; Geddes v. Anaconda Copper Mining Co., 1921, 254 U.S. 590, 41 S.Ct. 209, 65 L.Ed. 425; Southern Pacific Co. v. Bogert, 1919, 250 U.S. 483, 39 S.Ct. 533, 63 L.Ed. 1099; Overfield v. Pennroad Corporation, E.D.Pa.1941, 42 F.Supp. 586; Weisbecker v. Hosiery Patents, Inc., 1947, 356 Pa. 244, 51 A.2d 811.

### II.

### Alleged Neglect and Mismanagement by Defendants of the Affairs of Carbon and Catalyst.

7. In managing the affairs of Carbon and Catalyst respectively, those defendants who were in control of or charged with responsibility for the management and direction of Carbon or Catalyst were required to act in good faith and to exercise that degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in their personal business affairs. Section 408 of the Pennsylvania Business Corporation Law of 1933, 15 P.S. § 2852–408; Burkhart v. Smith, 1931, 161 Md. 398, 157 A. 299; accord, Freeman v. Hare & Chase, Inc., 1928, 16 Del.Ch. 207, 142 A. 793.

8. The burden of establishing the breach of this duty by any defendant and that harm resulted to the corporation as a result of the breach is on the plaintiff.

Uccello v. Goldin Foods, Inc., 1950, 325 Mass. 319, 90 N.E.2d 530, 16 A.L.R.2d 459; Hunt v. Aufderheide, 1938, 330 Pa. 362, 199 A. 345.

9. Plaintiff has not met this burden.

### III.
### Intercompany Transactions Between Mine Safety, Carbon and Catalyst

■ 10. Neither the fact that Mine Safety, Carbon and Catalyst had interlocking directorates nor the fact that Mine Safety was in potential and practical control of Carbon and Catalyst made dealings and transactions between and among these corporations void or voidable per se. Transactions between and among Mine Safety, Carbon and Catalyst would be declared invalid only where, on close scrutiny, fraud or unfairness was revealed. Bonini v. Family Theatre Corp., 1937, 327 Pa. 273, 194 A. 498; Bowman v. Gum, supra; Mercantile Library Hall Co. v. Pittsburgh Library Ass'n, supra. See also 3 Fletcher Cyclopedia Corporations (1947 Ed.) § 962.

■ 11. Because of its fiduciary obligation to Carbon and Catalyst, Mine Safety has the burden of proving that all transactions or dealings between it and Carbon or Catalyst which have been challenged were entered into in good faith, were to the best interests of Carbon or Catalyst and were inherently fair. Pepper v. Litton, supra; Geddes v. Anaconda Mining Co., supra; Pennsylvania Canal Co. v. Brown, 3 Cir.1916, 235 F. 669; Bonini v. Family Theatre Corporation, supra. See also 3 Fletcher Cyclopedia Corporations (1947 Ed.) § 974 and the cases cited thereunder.

12. Mine Safety has sustained this burden.

■ 13. The use of Jackson's services by Mine Safety in connection with the carbon dioxide indicator gave Catalyst no interest in or legal right to any profits which may have been earned by Mine Safety by the sale of the carbon dioxide indicator since Jackson was in the employ of Mine Safety at that time and since the arrangement for the sharing of employees between and among Mine Safety, Carbon and Catalyst was entirely fair to all parties.

### IV.
### Ownership of the Rebreather Patents of Dr. C. B. Jackson

■ 14. Jackson's employment contract with Catalyst is to be construed according to the law of Pennsylvania since it was entered into and executed in Pennsylvania. New York Life Ins. Co. v. Levine, 3 Cir.1943, 138 F.2d 286; Mann v. Salsberg, 1901, 17 Pa.Super. 280.

15. Jackson's employment with Catalyst was an employment at will. Hogle v. De Long Hook & Eye Co., 1915, 248 Pa. 471, 94 A. 190; Weidman v. United Cigar Stores Co., 1909, 223 Pa. 160, 72 A. 377.

16. In holding that Jackson was an employee of Mine Safety when working on the projects of Mine Safety, it is not necessary to decide that his employment with Catalyst had terminated. Bojarski v. M. F. Howlett, 1928, 291 Pa. 485, 140 A. 544; Robson v. Martin, 1928, 291 Pa. 426, 140 A. 339; Brown v. Saltillo Borough Council, 1939, 137 Pa.Super. 599, 10 A.2d 93. See also Restatement of Agency, § 226, Comment b, Illustration 5.

17. The use of Jackson's services by Mine Safety in connection with the rebreather gave Catalyst no interest in or legal right to any profits which may have been earned by Mine Safety by the sale of the rebreather.

■ 18. Jackson's covenant to assign to Catalyst is to be construed according to the law of Pennsylvania.

19. Jackson's covenant to assign to Catalyst must be strictly construed against Catalyst. White Heat Products Co. v. Thomas, 1920, 266 Pa. 551, 109 A. 685.

20. Jackson's covenant to assign to Catalyst is subject to two conditions, both of which must exist in order to create rights thereunder in Catalyst:

(1) The inventions or improvements must have been made by him during the course of his employment by Catalyst.

(2) The inventions must have been made in connection with the business of Catalyst.

■ 21. Where one is employed for the express purpose of using his inventive faculty to develop a specific process or

product for his employer, there is an implied agreement that any invention arising from the employment relating to that process or product shall be assigned by the employee to the employer in the absence of an express contract to the contrary. Standard Parts Co. v. Peck, 1924, 264 U.S. 52, 44 S.Ct. 239, 68 L.Ed. 560; Quaker State Oil Refining Co. v. Talbot, 1934, 315 Pa. 517, 174 A. 99.

22. The burden of establishing that Catalyst is entitled to the ownership of the rebreather patents allegedly misappropriated by Mine Safety is upon the plaintiff.

23. Plaintiff has not sustained this burden.

24. Jackson's covenant with Catalyst of May, 1935 did not require that he assign to Catalyst his rebreather inventions since these inventions were not made in connection with the business of Catalyst and since he was an employee of Mine Safety when he was working on the rebreathers.

25. Catalyst is not entitled to ownership of the patents obtained by Jackson in connection with his work on the rebreathers.

26. Catalyst is not entitled to any of the profits earned or which may be earned by Mine Safety through the sale of the rebreathers.

27. Plaintiff is not entitled to any of the relief prayed for in his complaint.

28. Accordingly, a judgment dismissing the action will be entered.